**SIGNED THIS: March 7, 2022**

_____
**Mary P. Gorman**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 18-71139 |
| WILLIAM E. BAKER, Jr., | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |

## O P I N I O N

Before the Court are claims filed by 3rd Sister Investment, LLC and Blackwater Energy, LLC. The Debtor objected to both claims asserting that the obligations described in the claims are debts of Belken Oil, LLC and that he has no personal liability for the claimed amounts. Because the claimants failed to prove that the Debtor has personal liability to them, the Debtor's objections will be sustained and the claims will be disallowed.

## I. Factual and Procedural Background

William E. Baker, Jr., ("Debtor") filed his voluntary petition under Chapter 7 on August 3, 2018. Relevant to the issues here, the Debtor scheduled both 3rd Sister Investment, LLC ("3rd Sister") and Blackwater Energy, LLC ("Blackwater") as unsecured creditors. He listed the amounts owed to each as "$0" and identified their claims as contingent, unliquidated, and disputed. He disclosed the basis of each potential claim as "Lawsuit."

3rd Sister and Blackwater, along with several other individuals and entities, filed an adversary complaint seeking to except a debt they claim is owed to them from the Debtor's discharge. In their complaint, they alleged that they entered into a contract with Belken Oil, LLC ("Belken"), a company managed by the Debtor, for the construction and operation of oil wells.[1] They further asserted that the contract was breached and that a judgment was entered in pending state court litigation in their favor and against Belken for $214,981.74. They said that the only remaining issue in the state court was a determination of the Debtor's personal liability but also claimed that the state court's judgment against Belken was *res judicata* as to the Debtor's personal liability. They argued that, because the debt was incurred through fraud, false pretenses, or defalcation as a fiduciary, the debt should be excepted from the Debtor's discharge.

---

[1] Although never discussed or explained at the trial, the complaint says that the plaintiffs other than Blackwater obtained their interests in the oil well contract with Belken through the assignment by Blackwater of portions of its 50% interest in the contract. The complaint is confusing in that regard because Blackwater is described as still having a 50% interest in the well and the percentage operating interests allegedly held by all the plaintiffs, including Blackwater, add up to a total of a little over 118%.

Andrew Erickson was appointed as the case trustee ("Trustee") and obtained a deadline for creditors to file claims. Prior to the expiration of that deadline, 3rd Sister and Blackwater each filed documents purporting to be claims. Neither used an Official Proof of Claim Form. An attorney for the claimants simply filed a copy of the adversary complaint with another copy of the same complaint attached as an exhibit in the claims register portion of the case docket on behalf of each claimant. The other plaintiffs identified in the adversary complaint did not file claims. The Debtor filed objections and, later, amended objections to the claims of 3rd Sister and Blackwater asserting that he has no personal liability for the amounts claimed. It is the Debtor's amended objections that are now before the Court.

While the adversary proceeding commenced by 3rd Sister and Blackwater was pending, the United States Trustee ("UST") filed an objection to the Debtor's discharge. The UST alleged that the Debtor had not scheduled all his assets and had made false oaths at his initial creditors meeting and at a court-ordered examination under Bankruptcy Rule 2004. After a contested trial, the Debtor's discharge was denied. *See Gargula v. Baker (In re Baker)*, 2020 WL 7767853, at *12 (Bankr. C.D. Ill. Dec. 29, 2020).

After the Debtor's discharge was denied, the adversary proceeding filed by 3rd Sister, Blackwater, and others was dismissed as moot. 3rd Sister and Blackwater then filed a motion for stay relief seeking to have the stay modified so they could try their claims in state court. After hearing, the motion was continued generally with the stay remaining in full force and effect as to claims

against estate property. This Court concluded that it should not abstain from the issues raised by the claims and claim objections and that granting stay relief as requested would effectively result in the state court deciding the substantive legal issue of whether the claims should be allowed in this case as personal liabilities of the Debtor. In the meantime, the Trustee reported that he had collected enough funds to pay all claims, other than those of 3rd Sister and Blackwater, in full. Thus, a decision on the Debtor's personal liability to 3rd Sister and Blackwater was necessary to determine whether the Trustee should continue pursuing the collection of other assets.[2] Although delayed by the retirement of the Debtor's original attorney and several substitutions of other attorneys for the Debtor, the claim objections were finally tried on September 2, 2021.

The trial of the claim objections began with a discussion of several procedural issues. The attorney for 3rd Sister and Blackwater had filed a motion several days before the trial asking for leave to file an amended exhibit list adding an exhibit that had not been timely disclosed pursuant to the requirements of the Court's trial order. The Court's standard trial order, which had been entered about six weeks before the trial, required parties to disclose and docket all proposed exhibits not later than one week before trial. Although

---

[2] The Trustee reported a potential surplus several times in open court but also included the representation in a motion to compromise a preference claim (Doc. 165) wherein he agreed that the settlement funds would be returned to the other party to the settlement if the claims of 3rd Sister and Blackwater were disallowed. The representation of a potential surplus was also made by the Trustee in his UST's Interim Report (Doc. 202) filed April 29, 2021. Additionally, the Trustee has put on hold an adversary complaint against the Debtor's son related to the alleged fraudulent conveyance of an interest in the Debtor's home, representing in a motion to extend time that pursuit of the complaint will not be necessary if the claims of 3rd Sister and Blackwater are disallowed. That cause of action was assigned adversary proceeding #20-07037.

3rd Sister and Blackwater's attorney had generally complied with the order by timely docketing a number of exhibits, his motion sought to tardily add an additional exhibit—a settlement demand letter sent by him to the state court attorney for Belken and the Debtor in 2014. Because no compelling reason for the failure to comply with the deadline was presented and the settlement demand letter was likely inadmissible in any event, the motion for leave was denied.

The Court also questioned the attorney for 3rd Sister and Blackwater about the amount of the claims. Although two separate claims for $214,981.74 were filed, the attorney acknowledged that there was one debt totaling $214,981.74 and that the debt was owed to "all of the claimants"—apparently referring to all the plaintiffs in the state court litigation and the adversary proceeding, not just 3rd Sister and Blackwater.[3] The attorney was also questioned about an objection that he had previously raised as to the Debtor's standing to bring the claim objections. He acknowledged that he was no longer questioning the Debtor's standing. Finally, the Court raised the issue of the burden of proof on the claims and claim objections, suggesting that 3rd Sister and Blackwater were not entitled to any presumption of validity because the claims as filed did not substantially comply with the Rules. Further, the Court noted that the claimants would have the burden of proof on the issue of the personal liability of the Debtor if the matter were tried in state court. After some discussion and some initial, incorrect insistence by the claimants'

---

[3] Throughout this Opinion, reference is made to "the claimants." In each instance, the reference is only to 3rd Sister and Blackwater, the entities that actually filed claims.

attorney that the claims had been filed using Official Forms, the attorney agreed that the claimants had the burden of proof on the Debtor's personal liability for the amounts claimed and accepted the burden of going forward.

The Debtor was called by the claimants as their first witness. He said that he had moved to Edinburg, Illinois, in 2012 for the specific purpose of becoming involved in the oil business with his uncle, Frank Holley. Previously, the Debtor had a career in law enforcement in Florida. He and his uncle created Belken to drill and operate oil wells. The Debtor said that he contributed money from his retirement fund to cover his share and his uncle's share of the initial capital Belken needed to begin drilling the first well. He said that his uncle left and went to Florida in April 2014 and that he operated Belken by himself thereafter.

Belken was created under the laws of the State of Illinois and remained in good standing, according to the Debtor. He recalled receiving articles of organization for Belken but could not recall whether he and his uncle had adopted a management agreement for the company. He admitted, however, that in a prior deposition he had said that no management agreement had been signed. He also thought they had kept minutes and records of meetings but was unsure where such minutes might be. He agreed that Belken was a member-managed company and that, at least initially, both he and his uncle had authority to act on behalf of Belken.

The Debtor testified that Belken had a bank account at Regions Bank in Taylorville, Illinois. He could not recall whether he had produced the bank

records in the state court litigation; he believed that he had. He said that he initially had a computer-savvy friend assist with Belken's bookkeeping and bill paying through the use of a QuickBooks account. Later, he used an accountant to assist in keeping Belken's financial records.

According to the Debtor, Belken entered into an Operational Agreement with Blackwater on December 1, 2011, for the purpose of drilling, completing, and producing an oil well in Christian County, Illinois. The Operational Agreement, presented as an exhibit by the claimants, recited that Belken and Blackwater would each contribute 50% of the funds needed to drill and complete the well and would share equally in the profits from oil production. Belken agreed to drill and complete the well with their jointly-contributed funds and to "have in place all permits, bonds, surveys and insurance needed and required by the State Oil and Gas board of Illinois." Blackwater and Belken agreed to sign a further Joint Operating Agreement to be negotiated by further mutual agreement. The Operational Agreement was signed by the Debtor on behalf of Belken and required Belken to immediately proceed with the drilling. The Debtor said that the Operational Agreement was negotiated for Belken by Larry Sweeney, who, according to the Debtor, received an assignment of one-half of Belken's interest in the contract, resulting in him having a 25% interest in the oil well. Mr. Sweeney's involvement was apparently well-known as the

claimants' attorney referred several times to the Debtor, his uncle, Mr. Holley, and Larry Sweeney as the individuals associated with Belken.[4]

Attached to the Operational Agreement was a two-page document labeled "A.F.E to Drill and Complete 2,000′ well (50% working interest)." The Debtor describe the A.F.E as an estimate of the costs expected to be incurred by Belken and Blackwater to drill and complete the well. Despite the reference to a 50% working interest, he was unsure whether the expenses listed were the full expected costs or only one-half of the expected costs. He agreed, however, that both Belken and Blackwater had contributed their respective shares of the initial anticipated costs to drill the well.

The Debtor acknowledged that one of the expected costs on the A.F.E was for insurance, and he agreed that the intent was to obtain liability insurance to cover Belken and Blackwater in the event of a claim against them for injury or property damage. He said that, as of December 1, 2011, no insurance had been purchased and explained that he could not find liability insurance coverage for an oil well venture from agencies in Christian County. He identified an insurance binder issued by Staley Insurance Agency of Casey, Illinois, with an effective date of February 9, 2012, and agreed that he had

---

[4] Strangely, two individuals, Larry Sweeney, Sr., and Larry Sweeney, Jr., are named plaintiffs in the state court litigation filed against Belken and the Debtor, and they both were included as plaintiffs in the adversary complaint to determine dischargeability. Neither filed a claim in this case. The description of their interests contained in both the state court and adversary pleadings does not explain how their interests were acquired or why, if they took their interests by assignment from Belken, they have standing to enforce the rights allegedly acquired by Blackwater against Belken from the Operational Agreement. According to the Debtor's trial testimony, one of the Larry Sweeneys had a 25% interest in the oil well. According to the adversary complaint, Larry Sweeney, Sr., individually "co-owned" an 11.66667% interest in the oil well, and Larry Sweeney, Sr., and Larry Sweeney, Jr., jointly held an additional 18.125% interest. None of these discrepancies were explained or even discussed at the trial or in the post-trial briefings.

eventually found insurance coverage and that Belken had purchased the policy evidenced by the binder. The Debtor admitted that, prior to obtaining the coverage, an accident had occurred at the drilling site resulting in the death of an employee of a subcontractor. Belken and Blackwater were sued and incurred over $200,000 in attorney fees defending the lawsuit.[5] The Debtor agreed that Blackwater and the other investors had initially paid their share of the attorney fees as they were billed but later refused to pay and, thereafter, he paid the attorney fee bills as they became due.

According to the Debtor, after the well was completed, the oil produced was sold to Bi-Petro through what he referred to as the YES program. The Debtor identified a series of documents, marked as exhibits by the claimants, as copies of monthly statements Belken sent to Bi-Petro for reimbursement of its expenses. He explained that each month Bi-Petro would pick up the purchased oil, pay Belken its claimed expenses, and then divide the remaining proceeds pro rata among the investors. The Debtor agreed that Belken did not attach receipts or other documentation for its expenses to the monthly statements but also asserted that it was not required to do so. The statements to Bi-Petro were all signed by Frank Holley and not the Debtor.

---

[5] A gap in the evidence related to the outcome of the lawsuit; no testimony was presented about the outcome of the action. This Court may take judicial notice on its own initiative of facts that can be "accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b), (c). The claimants identified the lawsuit in their complaint as Amanda West, et al. v. Belken Oil, LLC, filed in the circuit court of the Fourth Judicial Circuit, Christian County, Illinois, and assigned case #2013-L-27. A search of the Christian County Circuit Clerk's online docket shows that the action was filed on June 27, 2013, and was dismissed voluntarily by the plaintiffs without prejudice on August 24, 2015. No judgment was entered against Belken or any other defendant, and the "without prejudice" dismissal suggests that no settlement was made. The case has not been reinstated.

At some point, the sales to Bi-Petro stopped and the oil was sold to other entities. Thereafter, Belken used a similar monthly form to bill the investors directly for their share of monthly operating expenses. The Debtor identified copies of monthly billings to several different investors showing the total of expenses and the particular investors' shares of the charges. He agreed that Belken did not provide the investors with receipts for the expenses but again claimed that it was not required to do so and was not asked to do so. The statements were not signed by any representative of Belken.

The Debtor acknowledged that he was sued by 3rd Sister, Blackwater, and other investors in 2014 and that the suit claimed that the investors should not have to pay the attorney fees related to the accident at the drilling site that occurred before insurance was obtained and that Belken had overcharged for some expenses in the monthly statements.[6] He did not recall any demands being made or questions raised about the issues before the suit was filed. He acknowledged that a judgment was entered in the state court case against Belken for $214,700.[7]

The Debtor's testimony was tedious due both to his own persistence in anticipating the claimants' attorney's questions and the attorney's repeated questioning of the Debtor in a manner that did not focus on the issues before the Court. The Debtor repeatedly answered questions in the negative even

---

[6] The case, 3rd Sister Investment LLC, et al. v. Belken Oil LLC and William Baker, Jr., was filed in the circuit court of the Fourth Judicial Circuit, Christian County, Illinois, and assigned case #2014-CH-69.

[7] The amount of the state court judgment was $214,981.74, as referenced throughout this Opinion. In testifying otherwise, the Debtor merely agreed with the claimants' attorney's mistaken assertion that the judgment amount was $214,700.

though the questions were foundational and should have been answered affirmatively. He obviously did not want to agree to anything suggested by opposing counsel and repeatedly refused to concede even preliminary points. The claimants' attorney did not help things by his repeated questioning of the Debtor about whether the Debtor had brought documents to the hearing even though, admittedly, the Debtor had not been requested to bring any documents to the hearing. Likewise, his repeated questioning of the Debtor about whether certain documents had been produced in the state court litigation, when no discovery disputes had occurred in the matter being tried, was not helpful.

The claimants next called Nathan Frisch as a witness. He said that he was a licensed attorney and was associated with a law firm in Christian County with which the claimants' attorney had previously practiced. In that capacity, he had assisted in the state court litigation against Belken and the Debtor. He recalled that the lawsuit involved a claim for attorney fees that had been charged to the oil well investors and for expenses charged without providing invoices. Attorney Frisch said that he was tasked with preparing and serving discovery requests in the litigation. Although there was delay in compliance with the discovery requests, the Debtor and Belken ultimately provided four boxes of receipts and other documents that Attorney Frisch described as unorganized.

Attorney Frisch said that he organized the documents from the boxes and created spreadsheets to compare the documents produced with the monthly expense statements for the years 2012, 2013, and 2014. He created

spreadsheets showing the amounts that had been charged and paid, and also created similar spreadsheets including only those expenses for which documentation had been provided. He then compared the two and created a third spreadsheet for each year, deducting from the amounts charged and paid the amounts for which no documentation had been received. He also deducted the disputed attorney fees. He said that, for 2012, he calculated $145,911.13 in disputed charges, $62,510.50 of which was for the attorney fees. For 2013, he said he calculated $69,519.73 in disputed charges, $32,973.63[8] of which related to the attorney fees. For 2014, he calculated disputed charges of $138,531.54,[9] of which $43,503.19 was attributed to attorney fees. He concluded by saying that the state court reduced his total of $353,959.10[10] by the $138,987.36 charged for attorney fees, resulting in the final judgment amount of $214,981.74 entered against Belken.

The Debtor's attorney repeatedly objected to Attorney Frisch's testimony, questioning the relevance of the testimony and arguing that the parties had agreed that this Court was bound by the state court's final order fixing the amount of disputed charges other than attorney fees. Although the testimony was admitted over objection, the claimants' attorney was admonished that it appeared to have little to do with the issue of the Debtor's personal liability.

---

[8] Attorney Frisch agreed to the claimants' attorney's representation that the amount for legal fees in 2013 was $32,973.63. The amount listed on the spreadsheets, however, was $32,973.67.

[9] Here too, the witness agreed to the claimants' attorney's suggestion that the disputed charges for 2014 totaled $138,531.54, rather than the $138,538.24 listed in his spreadsheets.

[10] Again, the claimants' attorney suggested a figure to which the witness agreed. But that figure is inconsistent with both Mr. Frisch's testimony and the spreadsheets he created. The total amounts expended, as calculated on the spreadsheet, were actually $353,969.10. And only by subtracting total attorney fees from that figure does the final judgment amount of $214,981.74 result.

The claimants' final witness was Donald Marshall, a principal in Blackwater. Mr. Marshall identified the Operational Agreement and the attached A.F.E. He said that A.F.E meant "authority for expenditure" and explained that the list included the expenses they—Belken and Blackwater—planned to incur to drill and complete the well. He agreed with his attorney's suggestion that the $2500 line item for insurance was for liability and casualty insurance. He said that, when he found out that Belken had not purchased liability insurance, he found insurance coverage for the project. He acknowledged under cross examination that Illinois does not require operators of oil wells to have liability and casualty insurance.

During the testimony of witnesses, the claimants' attorney asked for the admission of exhibits identified and discussed by those witnesses; all such exhibits were admitted. At the close of testimony, he asked for the admission of additional exhibits, including certified copies of several iterations of the state court complaint and orders entered by the state court on May 30, 2017, and July 21, 2017. Those documents were all admitted without objection.

The state court order entered May 30, 2017, says that it resolves an amended motion for partial summary judgment filed by Blackwater, 3rd Sister, and the other investors. The order says that the amended motion as to the Debtor was continued; nothing in the order purports to resolve any issue related to the Debtor, and no judgment was entered against him in any respect. The order is limited to resolution of a count for breach of contract based on the charging of attorney fees and alleged overcharging of operating expenses by

Belken, as well as a count for consumer fraud based on the same factual allegations. In the order, the state court found that no evidence had been presented that Illinois required any type of insurance for oil well operators and that the Operational Agreement only required Belken to buy insurance specifically required by law. The court found that the assertion by Blackwater, 3rd Sister, and the others in their amended motion that Belken had agreed to purchase general liability insurance and had agreed to indemnify Blackwater against personal injuries and property damage was a clear misstatement of the terms of the Operational Agreement. Summary judgment on the issues related to the purchase of insurance and the charging of attorney fees as operating expenses was denied. Summary judgment was granted as to the expenses that were not substantiated by Belken with proper documentation. Because the court was denying the amended motion as to the attorney fees, it asked for a recalculation of claimed damages.

The state court order entered July 21, 2017, says that it resolves a motion to reconsider the May 30th order filed by Blackwater, 3rd Sister, and the other investors. The order says that the motion is denied as it relates to the insurance issue and finds that, even if Belken was required to provide general liability insurance, there was no definitive proof of what such insurance would have covered or whether the insurance carrier might have found a basis to deny coverage. The court went on the clarify that it was also not granting summary judgment on the fraud count; it found that genuine issues of fact were in dispute on the issue of fraud. Apparently having received the

recalculation of damages it requested, the court did enter a final judgment against Belken in the amount of $214,981.74 for the amounts charged for operating expenses that could not be justified by Belken though the production of receipts or other documents.

The Debtor called no witnesses and provided no further testimony. His attorney did move for the admission of several additional certified copies of documents from the state court litigation. Those documents were admitted. The attorneys agreed to submit their closing arguments in writing. The schedule for submitting the written arguments has concluded and the matter is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Matters involving the administration of the estate, the allowance of claims against the estate, and the adjustment of the debtor-creditor relationship are core proceedings. 28 U.S.C. §157(b)(2)(A), (B), (O). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### III. Legal Analysis

*A. Threshold Procedural Issues*

Several threshold issues, including standing, the burden of proof, and the collateral estoppel effect of the state court orders, have been raised in this matter. A brief discussion of each issue is warranted.

*1. Standing*

Although debtors usually have a general, continuing interest in how their cases are administered, standing to actually participate in a contested matter must be based on a debtor having "a pecuniary interest in the outcome" of the particular matter. *In re Cult Awareness Network, Inc.*, 151 F.3d 605, 607 (7th Cir. 1998). Frequently, debtors do not have a pecuniary interest in how the assets of their bankruptcy estates are disbursed. *Id.* But a debtor can establish standing to prosecute or participate in claims litigation by showing the likelihood of a surplus after paying all claims. *Id.* at 608; *see also In re Stinnett*, 465 F.3d 309, 315-16 (7th Cir. 2006).

Here, the Debtor claimed to have standing when he filed his claim objections by making an affirmative assertion that he expected a surplus to be available after the payment of claims. Initially, it was not clear how much the Trustee would collect, and, in any event, the claim objections were held in abeyance pending the resolution of other issues. But now the Trustee has represented that he has more than sufficient funds on hand to pay all claims with the exception of the claims of 3rd Sister and Blackwater. Thus, there will

be a surplus if the Debtor prevails, and the Debtor has a pecuniary interest in the outcome of the claims litigation.

Further, as discussed previously, the Debtor's discharge has been denied. *Baker*, 2020 WL 7767853, at *12. Resolving whether the limited liability veil of Belken will be pierced so that the Debtor is personally liable for Belken's debts will have a significant pecuniary impact on the Debtor. Although the issue must be decided here to resolve pending claims, a decision against the Debtor would not just mean the loss of the expected surplus; it would also control the ability of the claimants to collect the entire debt from the Debtor. This fact establishes the existence of an actual case or controversy between the parties and supports a finding of constitutional standing. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 495 (7th Cir. 2005) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). It also supports a finding that the Debtor is the real party in interest in the litigation and has prudential standing. *Warth*, 422 U.S. at 499-500.

When asked at the beginning of the hearing whether there was any remaining objection to the Debtor's standing, the attorney for 3rd Sister and Blackwater said there was not. In the absence of objection and by reason of the likelihood of a surplus and the Debtor's discharge having been denied, this Court finds that the Debtor has standing to prosecute the claim objections.

### 2. Burden of Proof

When a proof of claim is filed, it is deemed allowed unless a party in interest objects. 11 U.S.C. §§501, 502(a). Thus, a creditor, at least initially, is not required to take any affirmative action to have a timely-filed claim allowed. But the required written statement that constitutes a proof of claim must conform substantially to the appropriate Official Forms. Fed. R. Bankr. P. 3001(a). A proof of claim filed in accordance with the Rules constitutes *prima facie* evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f). The failure to conform to the Rules is not necessarily, in and of itself, a basis to render a claim invalid and deny its allowance. *In re Minbatiwalla*, 424 B.R. 104, 112 (Bankr. S.D.N.Y. 2010); *In re Hartman*, 2009 WL 4043096, at *3 (Bankr. D.N.J. Nov. 20, 2009). Rather, that failure should generally result in the creditor losing the benefit of the presumptions of the validity and amount of the claim and therefore bearing the full burden of proof as to the claim. *Id*. In some cases, however, if a debtor has scheduled a potential claim as undisputed or, despite the noncompliance with the Rules, the claim on its face establishes its validity, the burden may remain with the objector to provide some evidence of why the claim should be disallowed. *Minbatiwalla*, 424 B.R. at 116.

Here, 3rd Sister and Blackwater made no effort to comply with the requirements of Rule 3001(a). They did not use an Official Proof of Claim Form but rather simply filed a copy of their adversary complaint to determine dischargeability with a second copy of the same complaint attached as an

exhibit.[11] Neither copy of the complaint included the attachments that had been filed in the adversary proceeding. The complaint makes reference to the judgment entered by the state court against Belken but acknowledges that the issue of the Debtor's personal liability for the debt remained pending and had not been resolved in the state court litigation. Nevertheless, the complaint alleges, without citation to any portion of either of the state court orders entered in 2017, that the state court judgment is *res judicata* as to the issue of whether the Debtor obtained money by false pretenses, false representations, or actual fraud. The complaint also repeats the allegation that Belken had agreed in the Operational Agreement to purchase general liability insurance coverage and indemnify Blackwater against personal injuries and property damage despite the fact that the state court specifically found that the allegation clearly misstated the terms of the Operational Agreement. The complaint does not include a prayer for relief in any specific amount. There are other problems with the complaint, but suffice it to say here that the complaint, filed as a claim, does not come remotely close to establishing the validity or amount of the claim on its face. Further, the Debtor scheduled any obligation he might have to 3rd Sister, Blackwater, and the other investors as disputed. The claims are not entitled to any presumption of validity or amount, and the claimants therefore have the burden of proof on all issues.

It is also important to note that, regardless of who has the initial burden of going forward with respect to a claim objection, the ultimate burden of proof

---

[11] The claims for 3rd Sister and Blackwater were filed using the ECF credentials of their attorney in this matter. The adversary complaint that purports to serve as the claims was signed by Attorney Nathan Frisch.

in claims litigation is imposed on the party who would bear the burden on the substantive issue in state court. *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20-21 (2000). 3rd Sister and Blackwater do not dispute that they had the burden of proof in the pending state court case on the issue of whether the limited liability veil of Belken should be pierced. Accordingly, they also do not dispute that they bear that ultimate burden here.

When the issue of the burden of proof was raised at the trial, the attorney for 3rd Sister and Blackwater suggested that, at a minimum, the Debtor should be required to present evidence of the existence of Belken. But the existence of Belken was never in dispute. In the adversary complaint that 3rd Sister and Blackwater rely on for their claims, they affirmatively pleaded that Belken "is, and at all times relevant was, an Illinois Limited Liability Company[.]" Having admitted the existence of Belken and relied on its existence in stating their purported claim, the issue cannot credibly be disputed by the claimants, and the Debtor had no duty to present proof on the issue.

For all the reasons set forth above, 3rd Sister and Belken bear the burden of proof on all issues related to the allowance of their claims.

### 3. Collateral Estoppel

The principles of collateral estoppel command that "[f]ederal courts must give state court judgments the same preclusive effect as a court in the rendering state, applying that state's law." *Gambino v. Koonce*, 757 F.3d 604, 608 (7th Cir. 2014) (quoting *Jensen v. Foley*, 295 F.3d 745, 748 (7th Cir.

2002)). The doctrine of collateral estoppel bars relitigation of an issue if certain requirements are met under the laws of the state in which the judgment was entered. *VanDettum v. Wease (In re Wease)*, 2016 WL 8078316, at *4 (Bankr. C.D. Ill. Nov. 28, 2016). "Under Illinois law, collateral estoppel requires that (1) the issues decided in the prior adjudication are identical to issues presented for adjudication in the current proceeding; (2) there be a final judgment on the merits; and (3) the party against whom estoppel is asserted was a party or in privity with a party in the prior action." *Gambino*, 757 F.3d at 608 (citation omitted) (internal quotation marks omitted). "[T]he party sought to be bound must actually have litigated the issue in the first suit and a decision on the issue must have been necessary to the judgment in the first litigation." *Id.* (citation omitted) (internal quotation marks omitted).

Determining the total amount owed by Belken to all the investors is a necessary threshold issue in determining the fractional amounts owed to the two claimants here by Belken. Here, the parties agree that the judgment in the amount of $214,981.74 was a final adjudication on the merits of Belken's liability to 3rd Sister, Blackwater, and the other investors for the amounts charged that could not be substantiated with receipts or other documents. The state court entered the judgment on the breach of contract count of the state court complaint. Thus, the judgment against Belken is fixed and the parties here, as they acknowledge, are collaterally estopped from relitigating Belken's liability or the amount it owes. But that is as far as the principles of collateral estoppel apply here.

The state court judgment expressly did not address the personal liability of the Debtor and expressly excluded any findings of fraud. Thus, the allegation in the adversary complaint that the state court orders are "*res judicata*" as to the Debtor's fraud is an outright misrepresentation of the state court orders. Likewise, the final amount owed by Belken is not necessarily the amount owed to 3rd Sister or to Blackwater. They each may have a fractional interest in the judgment amount, but what interest each has is not clear. Because the Court will find no personal liability of the Debtor for the debt, the issue of the percentage interests of the two claimants need not be reached.[12] Had the Court found against the Debtor on the issue, however, the amount of each claim would remain at issue. Although collateral estoppel applies in a limited fashion here, it provides little assistance to the claimants on the contested issues before this Court.

### B. Piercing the Limited Liability Veil of Belken

The claimants argue that the current law in Illinois is that limited liability companies provide no actual protections against liability to members and mangers of such entities for company debts based on agency, contract, or tort. They suggest that managers such as the Debtor are liable for essentially

---

[12] Likewise, the Court need not reach the alternate argument that the claims filed by 3rd Sister and Blackwater were filed on behalf of all the investors and should be allowed in the full amount of the state court judgment. That said, the findings and order entered here that the Debtor is not personally liable for the Belken judgment should bind all the investors under the principles of collateral estoppel. The order is final, on the merits, and resolves a required issue. All the investors claim to be in privity with Blackwater. Further, allowing the issue to be relitigated elsewhere by other investors would not only violate the principles of collateral estoppel but also the Illinois prohibition against claims splitting. *See Rein v. David A. Noyes & Co.,* 172 Ill. 2d 325, 342-43 (1996) (discussing *res judicata* but also referring to "other legitimate defenses").

all the obligations of the limited liability companies with which they are associated and that proof of the type of conduct generally necessary to pierce the veil of a corporation or limited liability company is not necessary. The claimants' argument is wrong and not supported by Illinois law.

### 1. Illinois Limited Liability Companies

The Illinois statutory protections for members and managers of limited liability companies in effect from 1998 until 2020 were:

§ 10-10 Liability of members and managers.

(a) Except as otherwise provided in subsection (d) of this Section, the debts, obligations, and liabilities of a limited liability company, whether arising in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of the company. A member or manager is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager.

(b) (Blank).

(c) The failure of a limited liability company to observe the usual company formalities or requirements relating to the exercise of its company powers or management of its business is not a ground for imposing personal liability on the members or managers for liabilities of the company.

(d) All or specified members of a limited liability company are liable in their capacity as members for all or specified debts, obligations, or liabilities of the company if:

(1) a provision to that effect is contained in the articles of organization; and

(2) a member so liable has consented in writing to the adoption of the provision or to be bound by the provision.

805 ILCS 180/10-10 (1998) (amended 2020).

The statute gave rise to some confusion and resulted in a division among Illinois courts as to the extent of the limited liability provided to members and managers. Although the statute clearly limits liability being imposed solely on the basis of being a member or manager of a limited liability company or for the failure to observe required formalities, a dispute arose as to whether the limited liability provision was so broad as to bar piercing the veil of limited liability companies under all circumstances, including fraud. In one key decision, an Illinois appellate court held that the statute did not bar traditional "bases for corporate veil piercing, such as alter ego, fraud or undercapitalization." *Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 960 (2008). Bankruptcy courts followed *Westmeyer*, finding that limited liability company members could "be held personally liable for acts of a LLC if similar grounds exist that have been traditionally used to pierce the veil of corporations." *Brown v. Real Estate Resource Mgmt., LLC (In re Polo Builders, Inc.)*, 388 B.R. 338, 384 (Bankr. N.D. Ill. 2008) (citations omitted). This Court has followed the relevant authority and held that "veil piercing is available with respect to members and managers of Illinois LLCs under traditional veil piercing theories[.]" *Denmar Builders, Inc., v. Suhadolnik (In re Suhadolnik)*, 2009 WL 2591338, at *4 (Bankr. C.D. Ill. Aug. 20, 2009); *see also York v. Gillison (In re Gillison)*, 2019 WL 994566, at *5 (Bankr. C.D. Ill. Feb. 28, 2019).

Not all Illinois courts, however, agreed with *Westmeyer*. Focusing on the language of the statute providing that the debts of a limited liability company are solely the debts of the company even when the debts arise in tort, another

Illinois appellate court held that members and managers could not be held liable for debts of a limited liability company unless the express conditions of §10-10(d) of the statute were met. *See Dass v. Yale*, 2013 IL App (1st) 122520, ¶44; *Carollo v. Irwin*, 2011 IL App (1st) 102765, ¶61. In response to such decisions, the legislature amended the statute in 2019, with an effective date of January 1, 2020, adding:

> (a-5) Nothing in subsection (a) or subsection (d) limits the personal liability of a member or manager imposed under law other than this Act, including, but not limited to, agency, contract, and tort law. The purpose of this subsection (a-5) is to overrule the interpretation of subsections (a) and (d) set forth in *Dass v. Yale*, 2013 IL App (1st) 122520, and *Carollo v. Irwin*, 2011 IL App (1st) 102765, and clarify that under existing law a member or manager of a limited liability company may be liable under law other than this Act for its own wrongful acts or omissions, even when acting or purporting to act on behalf of a limited liability company. This subsection is therefore intended to be applicable to actions with respect to which all timely appeals have not exhausted before the effective date of this amendatory Act of the 101st General Assembly as well as to all actions commenced on or after the effective date of this amendatory Act of the 101st General Assembly.

805 ILCS 180/10-10(a-5) (2020).

Since the amendment to the statute, bankruptcy courts considering the personal liability of members and managers of Illinois limited liability companies have continued to hold that the traditional theories of veil-piercing control. Members and managers who, for example, engage in fraudulent or tortious conduct on behalf of a company are subject to having the limited liability veil of the company pierced and their personal liability established.

*Groom v. Krook (In re Krook)*, 615 B.R. 479, 484 (Bankr. N.D. Ill. 2020);[13]
*Gillison*, 2019 WL 994566, at *5. To prevail, a creditor seeking relief against a
member or manager must present evidence of misrepresentation, fraud, alter
ego, or some other veil-piercing theory. *Ambassador Steel Fabrication, LLC v.
Thornton (In re Thornton)* 615 B.R. 824, 831-32 (Bankr. C.D. Ill. 2020);
*Aeschliman v. Vraney (In re Vraney)*, 2020 WL 1696104, at *6 (Bankr. N.D. Ill.
Apr. 7, 2020).

The clarifying amendment rejected the narrow view of *Dass* and *Carollo*
that members and managers of limited liability companies are only liable for an
entity's debts if they have consented in writing to a provision contained in the
articles of organization making them liable. But the clarifying amendment did
not change the potential liability of members and managers so as to remove all
limits on liability as the claimants here suggest.[14] Members and managers are
only liable for their "own wrongful acts and omissions[.]" 805 ILCS 180/10-
10(a-5). Personal liability is only imposed when evidence sufficient to support
veil-piercing has been presented. Courts considering the issue of
member/manager liability post-amendment have continued to rely on

---

[13] The claimants suggest in their post-trial memorandum that *Krook* supports their position that the 2020 amendment
to the statute makes veil-piercing unnecessary and that managers and members of limited liability companies are
liable for essentially all debts of the company regardless of their personal conduct. Nothing in *Krook* says that. To
the contrary, *Krook*, which resolved a motion to dismiss rather than an ultimate finding of liability, held that
allegations of tortious conduct by the member/manager were sufficient to state a personal cause of action. *Krook*,
615 B.R. at 484. And in holding that a claim for personal liability could be stated, *Krook* relied on case law
involving a corporate shareholder that was only relevant because the court there was considering a traditional veil-
piercing analysis. *Id.*; *Bank of Commerce & Trust Co. v. Strauss (In re Strauss)*, 523 B.R. 614, 632 (Bankr. N.D. Ill.
2014).

[14] To the contrary, the statutory reference to *Dass* and *Carollo* but no mention of *Westmeyer* or similar cases is a
clear indication that *Westmeyer* provides the correct approach. The language of the statute generally provides the
best evidence of legislative intent, and, "[w]here statutes are enacted after judicial opinions are published, it must be
presumed that the legislature acted with knowledge of the prevailing case law." *Roth v. Illinois Ins. Guar. Fund*, 366
Ill. App. 3d (787, 793-94) (citations omitted) (internal quotation marks omitted).

traditional veil-piercing theories. *See, e.g., Manny v. Udelhoven (In re Udelhoven)*, 624 B.R. 629, 642-46 (Bankr. N.D. Ill. 2021); *Thornton*, 615 B.R. at 832.

If the claimants' position were accepted, virtually all benefits of creating a limited liability company would be lost. Under their theory, members and managers would be liable for essentially all company debts, even in the absence of any conduct on the part of the member or manager creating such liability. But there is no fair reading of the statute—either as previously drafted or as amended—that supports totally reading "limited liability" out of the limited liability company statute. Members and managers of limited liability companies are only liable for debts of the company if they have affirmatively accepted liability or if the limited liability veil of the company is pierced. Here, there is no allegation that the Debtor affirmatively agreed to be liable for Belken's debts. Accordingly, the question of the Debtor's personal liability here must be resolved by considering the evidence presented regarding the traditional theories of veil-piercing.

## 2. Traditional Veil-Piercing

Traditional veil-piercing case law has generally related to corporations. A corporation is presumed to be separate and distinct from its officers, shareholders, and directors. *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1033 (2007). A similar presumption

should apply to a limited liability company; its members and mangers are separate and distinct from the company.

Under Illinois law, a corporate veil may be pierced, and an individual owner charged for a corporate debt, when the corporation is used as a mere instrumentality to conduct the individual's business. *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009) (citing *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491 (2005)). An individual will not be held personally liable unless there is such unity of interest or ownership between an individual and a corporation that their separate personalities cease to exist and an adherence to the fiction of a separate corporate existence would sanction fraud or promote injustice. *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985) (citations omitted). These corporate principles are applied when analyzing piercing the veil of a limited liability company. *See, e.g., Udelhoven*, 624 B.R. at 643 (citations omitted).

The first element of the analysis requires proof that the corporation or limited liability company was really a mere sham for its owners. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (citation omitted). Courts consider several factors in deciding whether a unity of interest and ownership exists. The factors include inadequate capitalization, corporate insolvency, commingling of funds, diversion of assets, and use of the entity as a mere façade for a dominant

owner.[15] *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 752 (7th Cir. 2012) (citing *Fontana*, 362 Ill. App. 3d at 503). No single factor is necessarily determinative of the outcome. *Id.* (citing *In re Estate of Wallen*, 262 Ill. App. 3d 61, 69 (1994)).

If the first element is established, then there must be proof that not allowing veil-piercing would either sanction fraud or promote injustice. *Van Dorn*, 753 F.2d at 570. The proof required is more than the mere "prospect of an unsatisfied judgment." *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 522-23 (7th Cir. 1991). "[C]ourts that properly have pierced corporate veils to avoid 'promoting injustice' have found that, unless it did so, some 'wrong' beyond a creditor's inability to collect would result[.]" *Id.* at 524. "Some element of unfairness, something akin to fraud or deception or the existence of a compelling public interest must be present in order to disregard the corporate fiction." *Pederson v. Paragon Pool Enters.*, 214 Ill. App. 3d 815, 822 (1991) (citation omitted).

Consideration of whether to pierce the limited liability veil of Belken starts with review of the claim, which as explained above, consists of a copy of a dischargeability complaint. The complaint makes no allegations that Belken was a sham or that there was such a unity of interest between Belken and the Debtor that their separate existences should be disregarded. Likewise, the complaint contains no description of any injustices other than the potential

---

[15] The listed factors are non-exhaustive. Factors often considered but not listed above, such as the failure to issue stock, nonfunctioning corporate officers, and the failure to observe corporate formalities, are not relevant here because the statute specifically provides that the failure to follow formalities does not result in personal liability for members and managers of limited liability companies. 805 ILCS 180/10-10(c); *see Thornton*, 615 B.R. at 831.

nonpayment of a debt. No details of any fraud are pleaded; to the contrary, there is an invocation of the concept of *res judicata*, suggesting, albeit inaccurately, that the fraud issue was resolved by the state court. The complaint does not lay out a framework for consideration of the issues raised by the claimants' attempt to pierce Belken's limited liability veil.

The complaint does allege that the Debtor was a member or manager of Belken but then goes on, in large part, to ignore the existence of Belken and allege that all acts that support the claims were taken by the Debtor in his individual capacity. The complaint says that the Debtor and Blackwater were the joint owners of the rights to the oil well, that the Debtor entered into the Operational Agreement, and that the Debtor had been appointed the operator for the well. These allegations contradict the claimants' own exhibit showing that the Operational Agreement was entered into by Belken and Blackwater and that Belken was expressly nominated in the document to be the well operator. These misrepresentations are troubling because, by November 2018 when the adversary complaint was initially filed and then refiled as a claim, the claimants and their attorneys had already prevailed against Belken in state court based on proof of Belken's obligations under the Operational Agreement. Further, the complaint repeats the allegation that Blackwater had been granted an indemnification against claims for personal injuries and property damages through the Operational Agreement. Again, by the time these allegations were made in filings before this Court, the state court had already called out the claimants and their attorneys for "clearly" misstating the terms of the

Operational Agreement in making such claims. Here, the claimants not only repeated the obviously-wrong allegations, they doubled down and said that it was the Debtor individually who had agreed to provide the indemnification to Blackwater. These allegations are just not true; no indemnification was promised in the Operational Agreement by anyone to anyone, and the claimants and their attorneys knew it.[16]

The problems with both the form and content of the claims did not come to the Court's attention until the hearing. But, just as with the failure to use the Official Form described above, the obvious and serious misrepresentations in the documents do not preclude resolution of the ultimate issue here. The complaint is not evidence; it was reviewed to understand the theories of the claims. The claims will be disallowed not because of their form or substance but because the claimants failed to present sufficient evidence to support piercing Belken's limited liability veil.

The claimants presented little evidence about the operation of Belken. The Debtor was asked a few questions about how the company's bookkeeping and banking were handled, but no questions focused on whether Belken was a sham or whether such a unity of interest existed between Belken and the Debtor that their separateness should be ignored. In their post-trial memorandum, the claimants admitted that they presented no proof of any diversion of assets from Belken to the Debtor. Although only a factor to be

---

[16] The complaint also alleges that the lawsuit related to the accident at the drilling site that caused significant attorney fees to be incurred was still pending and remained undetermined. But the lawsuit was dismissed in 2015, almost three years before this case was filed and the complaint was filed both as an adversary proceeding and as a claim. The representations about the lawsuit should have been verified before the pleading was signed and filed.

considered, proof of the diversion of assets is often key in establishing that an owner is treating an entity as his own and that the two should be considered as one. In their post-trial memorandum, the claimants argued only that they presented proof of inadequate compliance with formalities, undercapitalization, and insolvency, and it is based on those theories that they seek to pierce the limited liability veil of Belken.

With respect to the failure to follow formalities, the claimants suggest that the factor may be less significant when piercing the veil of a limited liability company rather than a corporation. But here it is not a question of the significance or weight to be given to the factor; it is a question of whether the factor should be considered at all. It should not. The statute provides that "[t]he failure of a limited liability company to observe the usual company formalities or requirements to the exercise of its . . . management of its business is not a ground for imposing personal liability on the members or mangers[.]" 805 ILCS 180/10-10(c). Thus, the argument put forth that the Debtor's failure to remember whether Belken had a membership or management agreement is not a basis for piercing the veil. Equally important, Illinois does not require membership or management agreements to be created; operating agreements are allowed but not mandated by statute. 805 ILCS 180/15-5. Limited liability companies are required to keep certain records, but the required records do not include receipts or proof of payments of expenses. 805 ILCS 180/1-40. And again, the failure to comply with the record-keeping

requirements is expressly excluded by statute as a basis for holding a member or manager personally liable for company debts. 805 ILCS 180/10-10(c).

Some of the claimants' arguments about record-keeping issues suggest that the Debtor's failure to comply with discovery in the state court and in this case should be charged against him and considered as a basis to hold him personally liable. The evidence, however, does not support that position. Attorney Frisch testified that Belken and the Debtor were slow to comply with discovery in the state court case and that, when they did comply, their production was unorganized. He did not testify as to any continuing or ongoing discovery issues. Likewise, no discovery disputes occurred in this case. To the contrary, once other issues were resolved and this Court was ready to take up the claim objections, the claimants reported that they were ready for trial. The delays in getting the matter tried were, at least in the Court's perception, all related to the retirement of the Debtor's original attorney and then the substitution of several different attorneys on his behalf. At the trial, no issues related to discovery were presented. Rather, the claimants' attorney asked the Debtor several times whether he brought documents with him that day even though no request to produce documents at the trial had been made. The failure of the Debtor to bring documents to the trial that no one asked him to bring is not a basis to hold him personally liable for the debts of Belken. The claimants have not established a basis for piercing the limited liability veil of Belken by reason of a failure to observe formalities and keep records.

The claimants also presented little evidence on the issue of undercapitalization. In considering whether an entity is undercapitalized, a court compares "the amount of capital to the amount of business to be conducted and obligations to be fulfilled." *Wachovia Sec.*, 674 F.3d at 752 (quoting *Fiumetto v. Garrett Enters., Inc.*, 321 Ill. App. 3d 946, 959 (2001)). The claimants presented no evidence regarding the amount of business done by Belken; this Court has no idea whether the transaction at issue here was the only business endeavor of Belken or whether it was one of many. Likewise, the total liabilities of Belken are not known, and the Debtor was not even questioned on that issue.

The claimants' attorney questioned the Debtor repeatedly about the fact that nothing significant was contributed to Belken by the Debtor or his uncle when the entity was first organized. The Debtor agreed but correctly pointed out that there was no need to contribute capital until Belken started doing business and incurring liabilities. Both the Debtor and Donald Marshall testified that, when they agreed to drill the oil well, they created the A.F.E to estimate the anticipated costs associated with the project and that both Belken and Blackwater then contributed their share of the amounts needed to fund the operation. Belken was capitalized with the amount of funds that the claimants themselves agreed was adequate. Further, the Operational Agreement provided that both Belken and Blackwater would continue to contribute funds for expenses as needed.

The thrust of the claimants' argument about undercapitalization relates to Belken failing to purchase insurance before beginning work on the oil well and the large amount of attorney fees that were incurred by the claimants and other investors after an accident occurred at the site. The Debtor's unrebutted testimony was that he was unable to find insurance from an agent in his area. The policy ultimately purchased was through an agent known to Donald Marshall located across the state. Although the parties contemplated buying insurance, the claimants have misrepresented, both here and in state court, the extent of the obligation of Belken with respect to the insurance. Belken's contractual promise to purchase insurance related only to the extent required by Illinois law; Illinois law does not require any insurance. It is not disputed that the Debtor, on behalf of Belken, looked for insurance but could not find it until Mr. Marshall stepped in and helped.

The issue then is whether Belken was undercapitalized due to the lack of insurance. The answer, based on the evidence presented, is that it was not. First, not having enough capital contributed to cover unanticipated events or, as here, to defend lawsuits that ultimately result in no liability being established, is not proof of undercapitalization. A company must be capitalized sufficiently to cover the expenses it intends to incur in the operation of its business. Belken, with the express agreement of the claimants, was capitalized sufficiently to cover all expected expenses. Second, the attorney fees were paid, and no one was ever called upon to pay a judgment. When the claimants and other investors stopped paying their share of the fees, additional contributions

were made by the Debtor to pay the legal bills. The claimants suggest that the Debtor's additional payments are proof of undercapitalization, but, to the contrary, they are proof of the Debtor's willingness to properly capitalize Belken even when other investors refused to pay their share. The failure to get insurance before beginning work was not good business judgment, but the evidence presented would not even support a finding that the venture became unprofitable because of the attorney fees paid. No evidence was presented on how much profit from the production of oil was distributed over the years to the investors. The evidence presented does not support a finding of Belken's undercapitalization and does not form a basis for piercing the veil of Belken.

The claimants also argue that Belken was insolvent and that its veil should be pierced on that basis. Being insolvent, according to the Code, generally occurs when an entity's debts exceed its assets. 11 U.S.C. §101(32). This definition, although not binding as a matter of state law, is helpful to the analysis here. The concept and analysis are similar to that of undercapitalization.

As set forth above in the discussion regarding undercapitalization, the claimants presented little evidence regarding the debts and assets of Belken. This Court does not know what assets Belken has; the Debtor said it had very little, but no balance sheet or other definitive information was presented. The only known debt of Belken is the judgment from the state court. The question of whether Belken might be able to satisfy the judgment or any portion of it was not addressed at the trial. The claimants argue that this Court can

presume insolvency based on the posture of the case. But there is no authority to presume insolvency just because the claimants are pursuing the Debtor here. Once the Debtor filed his bankruptcy, deadlines were set for adversary complaints and claims to be filed. The claimants were required to comply with those deadlines to preserve any rights they had against the Debtor. Thus, this Court can only presume that they filed what they filed here in order to meet the deadlines. No presumption of insolvency of Belken arises simply from their filings.

Importantly, insolvency is a factor in the veil-piercing analysis that, on its own, does not generally support finding personal liability. Businesses frequently fail and are unable to pay their bills. Absent fraud or some other compelling factor, however, that inability to pay bills alone is insufficient to support veil-piercing. *Sea-Land Servs.*, 941 F.2d at 524. If the inability to pay all bills was, in and of itself, a basis to pierce the veil of a corporation or limited liability company, then the veils of many such entities would routinely be pierced and the concept of limited liability would be meaningless. *Central Laborers' Pension Fund v. VanHuss (In re VanHuss)*, 633 B.R. 830, 840-41 (Bankr. C.D. Ill. 2021); *Peterson v. Colony American Finance Lender LLC (In re Mack Industries, Ltd.)*, 634 B.R. 1010, 1026 (Bankr. N.D. Ill. 2021) (construing similar Delaware law) (citations omitted). Generally, it is insolvency combined with fraud or diversion of assets that supports veil-piercing. *See, e.g., Wachovia Sec.*, 674 F.3d at 753 (insolvency occurring after shareholders raided company of its assets supported veil-piercing). Here, no evidence of fraud or diversion of

assets was presented. Belken may be insolvent; that is unclear. But even if it is insolvent, in the absence of other compelling factors, the veil of Belken should not be pierced. Nothing about the potential insolvency here supports a finding that Belken was a sham or alter ego of the Debtor, and nothing supports finding any injustice beyond non-payment.

## IV. Conclusion

The claimants and other investors in the oil well venture with Belken were, not surprisingly, annoyed by Belken's failure to obtain insurance before beginning work on the well site. The unfortunate accident resulted in significant attorney fees being incurred even though neither Belken nor any of the others were ultimately determined to be liable for the occurrence. This annoyance most likely led to the claimants demanding an accounting of all expenses incurred in the venture even though receipts and documentation had not been requested as the bills were paid and charged each month. Belken failed to produce documentation for all the expenditures resulting in a judgment being entered against it. Against this backdrop, the claimants want to pierce the veil of Belken and make the Debtor, one of the owners, liable for the judgment and perhaps more.

Piercing the veil of a limited liability company is, however, not easy or a common occurrence; it is an extraordinary remedy. Grounds must be established by competent evidence. Here, the claimants premised most of their case on a belief that the most recent amendments to the limited liability

company statute effectively removed the limited liability protections for members and managers. That did not happen; the amended statute clarified that limited liability veils may be pierced based on traditional case law but did not remove the protections altogether. Because the claimants did not think they had to produce proof to support veil-piercing, they produced little proof. Nothing was presented to support a finding that Belken was a sham or alter ego of the Debtor; there was no diversion of assets or proof of fraud. Nothing was presented to support ignoring the separate existences of Belken and the Debtor. No evidence of any injustice or compelling public policy was presented. This is a case, at best, of non-payment. Non-payment of a debt, however legitimate the debt may be and no matter how annoying the non-payment may be, does not alone support piercing the veil of a limited liability company. The claimants have not established that the Debtor is personally liable to them. The Debtor's claim objections will be sustained. The claims of 3rd Sister and Blackwater will be disallowed.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###